484 So.2d 568 (1985)
Robert ECHOLS, Appellant,
v.
STATE of Florida, Appellee.
No. 64246.
Supreme Court of Florida.
September 19, 1985.
Rehearing Denied March 31, 1986.
*570 Jerry Hill, Public Defender, and W.C. McLain, Asst. Public Defender, Tenth Judicial Circuit, Bartow, for appellant.
Jim Smith, Atty. Gen., and Davis G. Anderson, Jr., Asst. Atty. Gen., Tampa, for appellee.
SHAW, Justice.
Appellant Echols was convicted of one count each of first-degree murder, robbery with a firearm and armed burglary with an assault. The jury recommended life imprisonment on the first-degree murder conviction but the trial court imposed a death sentence. The trial court also sentenced appellant to life imprisonment on the robbery conviction and sixty years on the burglary conviction, with the court retaining jurisdiction for one-half of the latter sentence. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
The victim, Waldamar Baskovich, and his wife, Faye, moved to Clearwater, Florida, from Gary, Indiana, in the early 1960s. In the late 1970s, Faye's sister and brother-in-law, Gari and Alex Dragovich, also moved to Clearwater from Gary and resided with the Baskovichs for approximately two years. Waldamar Baskovich and Alex Dragovich had been business partners in Gary, but apparently the relationship between the men became unfriendly although Faye Baskovich retained a friendly relationship with her sister and brother-in-law. In late 1981 or early 1982, Alex Dragovich contacted appellant and hired him to murder Waldamar Baskovich. The motive for the murder was both personal antipathy and a desire to obtain control of the victim's estate through Dragovich's relationship with his sister-in-law. Dragovich and appellant planned to use the assets of the victim's estate as a means of promoting certain business enterprises and to share in the proceeds. In March 1982, appellant and an accomplice twice flew into Clearwater from Gary to murder Baskovich, but aborted the crime because of unfavorable circumstances. However, at approximately 2 p.m. on April 20, 1982, appellant and "Mad Dog" Nelson flew into Clearwater. At approximately 7:20 p.m. that evening, appellant and Nelson entered the Baskovich home where they found the Baskovichs. They confined Faye to a bathroom and placed Waldamar face down on the floor of the family room. Nelson fired two lethal shots from a handgun into Baskovich's head. Appellant and Nelson robbed and burglarized *571 the home, taking jewelry and a substantial sum of cash. They then struck Faye, leaving her dazed and apparently unconscious, and fled the scene. En route to the airport, the men discarded a handgun, jewelry boxes, the victim's wallet, and a bag taken from the home. They flew out of Clearwater at approximately 9 p.m. that evening. Through what can only be described as excellent police work, the police uncovered the connection between Dragovich and appellant: the handgun had been stolen from a Gary liquor store approximately seven years prior, records of toll phone calls between Dragovich's home in Clearwater and appellant's home in Gary were discovered, along with rental contracts on cars that appellant had used during his three trips to Clearwater.
The focus of the investigation then shifted to appellant and Gary, Indiana. The Clearwater police requested a photograph of appellant from the Indiana state police. The state police then asked an informant, Adams, who lived in a common law relationship with appellant's daughter, to obtain the photograph. Instead, Adams wired himself with a small hidden tape recorder and asked appellant if he was involved in a Florida murder. Appellant promptly stated that he was and boastfully recounted details of the crimes and the scheme between himself and Dragovich to obtain control of the victim's estate. Adams allowed the state police to hear the tape but retained custody, apparently as a bargaining ploy to obtain their assistance on criminal charges against him. Approximately fifty days later, Adams surrendered the tape to the police and agreed to, and did, tape another conversation with appellant. The Clearwater and Indiana police then executed an arrest warrant on appellant at his home and, with his permission, searched the home. They found evidence corroborating appellant's trips to Clearwater and statements he had made on the tapes. Very shortly after the arrest of appellant, and before Dragovich had heard of the arrest, Adams and an undercover Florida policeman contacted and met Dragovich for the purported purpose of receiving payment for the murder of Baskovich. The two meetings were simultaneously recorded on video and audio tapes. Although Dragovich was guarded in his remarks, the tape corroborated appellant's statements that he and Dragovich had planned and executed the Baskovich murder.
The evidence of appellant's guilt is overwhelming. Appellant argues, however, that much of the evidence was obtained in violation of his rights and should be excluded. We disagree. Appellant's initial point is that the first tape obtained by informant Adams in appellant's Gary, Indiana, home violates either State v. Sarmiento, 397 So.2d 643 (Fla. 1981), or chapter 934, Florida Statutes (1981). Appellant does not deny that under Indiana and federal law the tape is admissible, but argues that we should apply Florida law to the actions of Adams and the Indiana police because Florida's interest in the prosecution of this capital felony is greater than that of Indiana. In support, appellant cites People v. Rogers, 74 Cal. App.3d 242, 141 Cal. Rptr. 412 (Ct.App. 1977), vacated on other grounds, 21 Cal.3d 542, 579 P.2d 1048, 146 Cal. Rptr. 732 (1978). We agree that Florida's interest in prosecuting the case is greater than that of Indiana and that it would be appropriate to apply Florida law if we found that Florida's interests were served thereby. However, we do not agree that Florida's interests are served by excluding relevant evidence which was lawfully obtained in Indiana in conformity with the United States Constitution and Indiana law. McClellan v. State, 359 So.2d 869 (Fla. 1st DCA), cert. denied, 364 So.2d 892 (Fla. 1978). The primary purpose of the exclusionary rule is to deter future official police misconduct. United States v. Janis, 428 U.S. 433, 446 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976). We do not believe exclusion of the evidence would have any discernible effect on police officers of other states who conduct investigations in accordance with the laws of their state and of the United States Constitution. Further, we do not believe that the interest of Florida is served by imperially attempting to *572 require that out-of-state police officials follow Florida law, and not the law of the situs, when they are requested to cooperate with Florida officials in investigating crimes committed in Florida. We agree with Justice White that:
[A]ny rule of evidence that denies the jury access to clearly probative and reliable evidence must bear a heavy burden of justification, and must be carefully limited to the circumstances in which it will pay its way by detering official unlawlessness.
Illinois v. Gates, 462 U.S. 213, 257-58, 103 S.Ct. 2317, 2342, 76 L.Ed.2d 527 (1983) (White, J., concurring in the judgment). See also United States v. Leon, ___ U.S. ___, 104 S.Ct. 3430, 82 L.Ed.2d 702 (1984).
Appellant also argues that the second tape obtained by informant Adams was obtained through exploitation of the illegally obtained first tape in violation of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Our determination that the first tape was admissible disposes of this argument. In any event, even if it were error to admit the second tape, the first tape contained a full statement of appellant's participation in the crimes. Indeed, the second tape appears to have been made primarily for the purpose of obtaining information on the role of "Mad Dog" Nelson and Dragovich in the crimes. Thus, admission of the second tape, even if error, was harmless.
Appellant next argues that the trial court erred in denying a motion for continuance and a related motion for the appointment of a voiceprint expert to determine if it was appellant speaking on the second tape. This issue requires some factual background. Appellant was advised in January 1983 that the state possessed recorded oral statements made by him to Adams. Copies of the two tapes were first furnished to appellant in April 1983, and additional copies provided in May 1983. However, appellant maintained that the copies were inaudible. A third set was provided in June 1983, but appellant maintained that both tapes were copies of tape one and that an audible copy of tape two was not provided until July 14, 1983. On July 19, 1983, appellant moved for a continuance of the trial which was set for July 26, 1983, on the ground that it was not his voice on the second tape and that additional time was needed for the appointment of voiceprint experts and their analyses of the voices on the tape. The motion was denied on July 20, 1983, again on July 22, 1983, and on commencement of the trial on July 26, 1983. The granting or denial of a motion for continuance is within the sound discretion of the trial court and will not be overturned absent a palpable abuse of discretion. Lusk v. State, 446 So.2d 1038 (Fla.), cert. denied, ___ U.S. ___, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984); Jent v. State, 408 So.2d 1024 (Fla. 1981), cert. denied, 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982); Zeigler v. State, 402 So.2d 365 (Fla. 1981), cert. denied, 455 U.S. 1035, 102 S.Ct. 1739, 72 L.Ed.2d 153 (1982). We see no abuse of discretion. We note, first, that two earlier continuances had been granted and that appellant had known for months that the state had two tapes purporting to contain inculpatory statements that he had made to Adams. No one was in a better position than appellant to know whether he had made inculpatory statements to Adams and, indeed, appellant does not contest the validity of the first tape. Reserving the argument that it was not his voice on the second tape until the eleventh hour suggests an effort to further delay the thrice-scheduled trial. Further, the jury itself was capable of determining whether the voice on the second tape was the same voice as that on the first tape which appellant acknowledged was his own. In reaching this determination, the jury had the evidence of Adams who was present at the taping, and of Indiana witnesses who had known appellant for years and testified that it was he speaking on the tapes.
Appellant next argues that portions of the second tape contained evidence of other crimes committed by "Mad Dog" Nelson which should have been excluded because they unduly prejudiced appellant *573 without showing that he was guilty of the crimes here. We disagree. The discussion by appellant in the tape of Nelson's reputation and character fitted into the context of the crimes to show why appellant had hired him and the roles played by appellant and Nelson in the crimes. All relevant evidence is admissible until it is shown to be inadmissible for some lawful reason. We see no reason why the portion of the tape objected to should have been excised. § 90.402, Fla. Stat. (1981); Heiney v. State, 447 So.2d 210 (Fla.), cert. denied, ___ U.S. ___, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984); Ruffin v. State, 397 So.2d 277 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981).
Appellant next argues that the trial court erred in limiting his cross-examination of the state's chief investigator. More specifically, appellant argues that he should have been permitted to question Detective McManus regarding (1) whether there were attempts to perform a voiceprint analysis of the two Adams/Echols tapes; (2) whether Faye Baskovich made an "excited utterance" to him and assisted in making an artist's rendering of the two men who murdered her husband; and, (3) whether Detective McManus had developed an alternate suspect during his investigation. In Steinhorst v. State, 412 So.2d 332, 337 (Fla. 1982), we recognized that one accused of a crime has a right to a full and fair cross examination. Nevertheless, we also recognized that cross examination of prosecution witnesses by exceeding the scope of direct examination is not an acceptable vehicle for presenting the defendant's case-in-chief. Of the three subjects above, Detective McManus's direct testimony contains no reference to or suggestion of the latter two. Concerning the tapes, the first subject, Detective McManus testified only that he received the tapes from the Indiana police, that he had listened to them numerous times and the transcripts accurately reported their contents, and that certain "bushes" referred to by appellant in the tapes did in fact exist at the time of the crimes. The tapes themselves were introduced into evidence by another witness. We see nothing in Detective McManus's direct testimony offering an opening for cross examination on whether there had been an attempt to perform voiceprint analyses of the tapes. Nor does appellant argue that the purpose of the cross examination was to impeach the credibility of the witness.
Appellant next urges that admission of a pink jewelry box containing "Mad Dog" Nelson's thumbprint was irrelevant and prejudicial because it was not shown that the jewelry box was taken from the Baskovich home. Faye Baskovich testified that jewelry was taken. Investigating officers found jewelry boxes and other items discarded in the streets leading away from the Baskovich home. The Nelson thumbprint on the box corroborated appellant's statement to Adams that Nelson was his accomplice and Faye Baskovich's testimony that jewelry was taken.
Appellant next argues that it was error to admit the videotape of Dragovich's meetings with Adams and an undercover policeman wherein Dragovich confirmed that he and appellant had planned the murder in order to obtain control of the victim's estate. Appellant's point is that the murder had already been accomplished and the statements were not in furtherance of the conspiracy to murder Baskovich. We disagree. The videotape was relevant to the premeditated conspiracy to murder Baskovich and corroborated other evidence showing premeditation between Dragovich and appellant to commit the murder. In Florida all relevant evidence is admissible except as provided by law. § 90.402, Fla. Stat. (1981). Although conspiracy itself was not charged, the proof of premeditation consisted largely of proof of a conspiracy to commit murder in order to obtain control of the victim's estate. The videotape was thus admissible under section 90.803(18)(e), Florida Statutes (1981).
Appellant next argues that the trial court erred in refusing to instruct the jury on justifiable and excusable homicide as part of the manslaughter instruction. We *574 disagree. The jury was instructed on justifiable and excusable homicide as part of the standard jury instruction. Further, no reading of the evidence would justify a finding of justifiable or excusable manslaughter. It cannot be said that appellant was resisting an attempt to commit a murder or felony by the victim or that the killing was committed by accident or misfortune in doing a lawful act, or in the heat of passion, or upon sudden and sufficient provocation, or upon sudden combat, or without any dangerous weapon being used. The victim was an elderly man with an artificial leg who was killed by armed intruders in his own home when the intruders placed him face down on the floor and fired two shots into the back of his head. In addition, manslaughter is a lesser included offense, three steps removed, of first-degree murder and the jury, if inclined to exercise its "pardon" power, could have returned verdicts of second-degree or third-degree murder. State v. Abreau, 363 So.2d 1063 (Fla. 1978).
Appellant next argues that the trial court erred in applying section 947.16(3), Florida Statutes (Supp. 1982), by retaining jurisdiction over the first half of the sixty-year sentence on the burglary sentence. Appellant was also sentenced to death for first-degree murder and life imprisonment for robbery with a firearm, all sentences to be concurrent. Section 947.16(3) provides: "When any person is convicted of two or more felonies and concurrent sentences are imposed, then the jurisdiction of the trial court judge as provided herein shall apply to the first half of the maximum sentence imposed for the highest felony charged and proven." Appellant's position is that the highest felonies for which sentences were imposed were first-degree murder and robbery with a firearm and that the trial judge could not retain jurisdiction over the indeterminant sentences for these convictions. Cordero-Pena v. State, 421 So.2d 661 (Fla. 3d DCA 1982). Thus, appellant argues, the trial court had no jurisdiction under section 947.16(3) to retain jurisdiction for the lowest felony. Appellant's argument is ingenuous but circular. We agree that the trial court could not retain jurisdiction of one-half of an indeterminate sentence, but disagree that the trial court erred. The appellant's argument is meritless. The clear intent of section 947.16(3) is to permit the trial court to retain jurisdiction of up to one-half the maximum determinate sentence.

PENALTY PHASE
Appellant argues four issues in the imposition of the death sentence. Two have been repeatedly decided contrary to appellant's position: a trial court's override of a jury's recommendation of life does not unconstitutionally violate the double jeopardy, due process, and cruel and unusual punishment provisions of the United States Constitution and the death penalty in Florida is not unconstitutionally applied pursuant to a pattern and practice of discrimination with a disproportionate impact on blacks. Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); Martin v. State, 455 So.2d 370 (Fla. 1984); State v. Washington, 453 So.2d 389 (Fla. 1984) (and cases cited therein); and Porter v. State, 429 So.2d 293 (Fla.), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983) (and cases cited therein).
Appellant argues that the trial court erred in finding certain aggravating circumstances and in excluding existing mitigating circumstances. The trial court found that the murder was cold, calculated and premeditated and that the murder was committed for pecuniary gain. Appellant argues that this was a contract killing for pecuniary gain and that it was improper to double up the aggravating circumstances based on the same facts. Clark v. State, 379 So.2d 97 (Fla. 1979), cert. denied, 450 U.S. 936, 101 S.Ct. 1402, 67 L.Ed.2d 371 (1981); Provence v. State, 337 So.2d 783 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). Clark and Provence are inapposite. The two aggravating factors are not based on the same essential feature of the crime or of the offender's character. Agan v. State, *575 445 So.2d 326 (Fla. 1983), cert. denied, ___ U.S. ___, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984); Waterhouse v. State, 429 So.2d 301 (Fla.), cert. denied, 464 U.S. 977, 104 S.Ct. 415, 78 L.Ed.2d 352 (1983). There is no doubt that appellant was motivated by a desire for pecuniary gain. There is also no doubt that the murder was planned and carried out in a cold, calculated and premeditated manner without any pretense of moral or legal justification well above that required to prove premeditation. There is no reason why the facts in a given case may not support multiple aggravating factors provided the aggravating factors are themselves separate and distinct and not merely restatements of each other as in a murder committed during a robbery and murder for pecuniary gain, or murder committed to eliminate a witness and murder committed to hinder law enforcement. Squires v. State, 450 So.2d 208 (Fla.), cert. denied, ___ U.S. ___, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984); Combs v. State, 403 So.2d 418 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2258, 72 L.Ed.2d 862 (1982).
Appellant's next point is that the trial court improperly used lack of remorse as an aggravating factor. Pope v. State, 441 So.2d 1073 (Fla. 1983). The situation here is distinguishable from Pope. In examining the mitigating evidence that appellant was outwardly a businessman, churchgoer, family man, and generally a law abiding citizen, the trial judge found that appellant's statements on the tapes showed that his real character was entirely different: appellant was a cunning, conscienceless, criminal, capable of carrying out a sophisticated murder without a twinge of regret. The trial court was required to set forth the reasons for its findings. It was not improper to use the evidence to negate mitigation.
Appellant's next point is that the trial court improperly refused to consider appellant's age, fifty-eight years, in mitigation. We disagree. During the conference on jury instructions, defense counsel suggested that age should be a mitigating factor but that he was not absolutely certain on the law and could not offer any legal argument or case law showing that it was a factor. The judge ruled that he did not think it was appropriate in this case to instruct the jury that it was a mitigating factor. The record does not show that defense counsel objected to the ruling. In any event, the jury was instructed that it could consider in mitigation any aspect of appellant's character or record and any other circumstances of the offense. Further, during argument to the jury, defense counsel informed the jury of appellant's age and argued that life imprisonment with a twenty-five year minimum was in fact a death penalty. We see no error under the circumstances. We have previously addressed this question of whether age, without more, is to be considered a mitigating factor in Agan and Peek v. State, 395 So.2d 492 (Fla. 1980), cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981), but the question continues to be raised. It should be recognized that age is simply a fact, every murderer has one, and it can be considered under the general instruction that the jury may consider any aspect of the defendant's character or the statutory mitigating factor, section 921.141(6)(g), Florida, Statutes (1981). However, if it is to be accorded any significant weight, it must be linked with some other characteristic of the defendant or the crime such as immaturity or senility. In this case, for example, we see nothing in the record that would warrant finding any truly mitigating significance in the appellant's age. On the contrary, appellant's age, along with the other evidence, suggests that appellant is a mature, experienced person of fifty-eight years, of sound mind and body who knew very well what he was undertaking and, equally, that the undertaking was without any pretense of moral or legal justification.
Appellant's next point on mitigation is that the trial court erred in failing to find certain nonstatutory mitigating circumstances and in finding nonstatutory aggravating circumstances. Appellant's argument is meritless. The trial judge considered the evidence in mitigation and determined *576 it had insufficient weight to overcome the aggravating factors. Further, in analyzing the mitigating evidence, e.g., appellant had a nonviolent character, the trial court simply rejected the notion that this brutal, contract murder was consistent with a nonviolent character. One of the unfortunate side effects of admitting any and all nonstatutory mitigating evidence is that it encourages the introduction of evidence which, in the context of the case, carries very little weight. As we said in Porter v. State, 429 So.2d 293, 296 (Fla.), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983):
The only requirement is that the consideration of mitigating circumstances must not be limited to those listed in section 921.141(6), Florida Statutes (1981). What Porter really complains about here is the weight the trial court accorded the evidence Porter presented in mitigation. However, "mere disagreement with the force to be given [mitigating evidence] is an insufficient basis for challenging a sentence." Quince v. State, 414 So.2d 185, 187 (Fla. 1982).
Id. Part of the difficulty is semantic. Technically, a trial judge does not reject evidence which is considered in mitigation. Instead, the trial judge finds that its weight is insufficient to overcome the aggravating factors.
Appellant's final point is that the trial court erred in overriding the jury's recommendation. In Tedder v. State, 322 So.2d 908, 910 (Fla. 1975), we set forth the test for determining whether it is proper to override a jury's recommendation of life imprisonment.
A jury recommendation under our trifurcated death penalty statute should be given great weight. In order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ.
Id. In determining whether the override was based on facts so clear and convincing that virtually no reasonable person could differ, we look to the trial court's sentencing order. The trial court found three aggravating factors. First, the murder was committed while appellant was engaged in both a robbery and a burglary in the home of the victim and his wife. The proceeds of the robbery and burglary were given to accomplice Nelson for his participation in the crimes. Second, the murder was committed for pecuniary gain. Appellant's pecuniary gain, however, was to come from controlling the assets of the victim's estate, not from the robbery or burglary. Third, the murder was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. We find that all three aggravating factors are established by the evidence beyond every reasonable doubt. We add that the record shows also as a fourth aggravating factor that the appellant had been previously convicted of robbery with a firearm and armed burglary with an assault. § 921.141(5)(b), Fla. Stat. (1981); Johnson v. State, 438 So.2d 774, 778 (Fla. 1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984); Daugherty v. State, 419 So.2d 1067, 1069 (Fla. 1982), cert. denied, 459 U.S. 1228, 103 S.Ct. 1236, 75 L.Ed.2d 469 (1983); King v. State, 390 So.2d 315, 320-21 (Fla. 1980), cert. denied, 450 U.S. 989, 101 S.Ct. 1529, 67 L.Ed.2d 825 (1981); Lucas v. State, 376 So.2d 1149, 1152-53 (Fla. 1979). These prior convictions also negate the potential mitigating circumstance of no significant history of prior criminal activity. Teffeteller v. State, 439 So.2d 840, 846-47 (Fla. 1983), cert. denied, 465 U.S. 1074, 104 S.Ct. 1430, 79 L.Ed.2d 754 (1984); Ruffin v. State, 397 So.2d 277, 283 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981). We cannot determine whether the trial judge overlooked this fourth aggravating factor or was uncertain as to whether convictions for crimes committed concurrently with the capital crime could be used in aggravation. However, we note its presence in accordance with our responsibility to review the entire record in death penalty cases and the well-established appellate rule that all evidence and matters appearing in the record *577 should be considered which support the trial court's decision. Fla.R.App.P. 9.140(f); §§ 59.04 and 924.33, Fla. Stat. (1981); Cohen v. Mohawk, Inc., 137 So.2d 222 (Fla. 1962); Congregation Temple De Hirsch v. Aronson, 128 So.2d 585 (Fla. 1961); In Re Wingo's Guardianship, 57 So.2d 883 (Fla. 1952); Perkins v. City of Coral Gables, 57 So.2d 663 (Fla. 1952); Wallace v. State, 41 Fla. 547, 26 So. 713 (1899). In mitigation, the trial court found (erroneously) that appellant had no significant history of prior criminal activity but rejected the notion that appellant's participation in the murder was relatively minor. The critical question is whether the character testimony by four witnesses who were family members, friends, or associates was credible and sufficient to overcome the aggravating factors. The testimony was that appellant was a conscientious businessman, a devout churchgoer, a good family man, and, generally, a law-abiding citizen. The difficulty which the trial judge found in allocating sufficient weight to this testimony is that it is directly contradicted by the appellant's own statements in the two taped conversations he had with Adams. These statements are more than a confession of guilt, they reveal the appellant boastfully and gleefully recounting his criminal exploits and, as the trial judge put it, "shows the law-abiding surface character of this fifty-eight year-old man to be but a shielding cloak paraded before his family, his legitimate business associates, church and friends; in short, hypocrisy of the highest order." While most of these tapes were played to the jury, portions of the tapes available to the trial judge were withheld in order to avoid unduly prejudicing the jury. We hold that the aggravating factors here so clearly and convincingly outweigh the mitigating factors that no reasonable person could differ.
In addition to reviewing the specific arguments raised by appellant, we have also reviewed the record pursuant to Florida Rule of Appellate Procedure 9.140(f) and conclude that a new trial is not required.
We affirm the convictions and sentences.
It is so ordered.
BOYD, C.J., and ADKINS and EHRLICH, JJ., concur. dissent from the sentences.