620 So.2d 165 (1993)
Douglas CANNADY, Appellant,
v.
STATE of Florida, Appellee.
No. 76262.
Supreme Court of Florida.
May 6, 1993.
Rehearing Denied June 23, 1993.
*166 Nancy A. Daniels, Public Defender and David A. Davis, Asst. Public Defender, Second Judicial Circuit, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen. and Mark C. Menser, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Douglas Cannady appeals his convictions of two counts of first-degree murder and one count of attempted murder and the corresponding sentences, including two sentences of death. We have jurisdiction pursuant to article V, section 3(b)(1), of the Florida Constitution. We affirm all of Cannady's convictions and his sentence for attempted murder, but we reduce his death sentences to life imprisonment without parole for twenty-five years.
This tragic incident occurred on October 1, 1989, when Cannady murdered Georgia Cannady, his wife, and Gerald Boisvert, who he believed raped his wife, and attempted to murder Steve Russ, who previously was involved in a dispute with Cannady. Cannady was charged with two counts of first-degree murder and one count of attempted murder. The evidence at trial established that Cannady was married to Georgia Cannady and that together they had two children, Christopher, fifteen, and Angela, eighteen. The Cannadys lived in a double-wide mobile home behind a gasoline station, which Cannady ran, in Greenwood, Florida. Cannady also owned a bar. In the spring of 1989, Steve Russ got into a fight in front of Cannady's bar. Cannady broke up the fight by firing his gun. Russ was placed on community control for the incident and filed a complaint against Cannady for shooting the gun at him. Russ later dropped the complaint.
*167 On Sunday, July 23, 1989, Cannady and his family went over to a friend's house for dinner. At some point during the evening, Cannady passed out. At about 9 p.m., Cannady came to and asked for his wife, but no one knew where she was. Cannady, too drunk to drive, had his daughter pick him up and take him to various places to look for his wife. When he could not find her, Cannady called the sheriff's office and reported her missing. The next morning, Gerald Boisvert told him he had let Georgia Cannady out of his car at a truck stop. About noon, someone brought Georgia home and she told Cannady the same story Boisvert had given him. She added that, after Boisvert had left her, she left the truck stop with another woman.
Over the next few days, Cannady noticed several scratches on Georgia's shoulders and that she did not want to have sexual intercourse with him because she was "hurting." Cannady suspected that Boisvert had raped his wife and he took her to the sheriff's office to file a complaint. During the interview at the police station, Cannady dominated the conversation, and the officer had to ask Cannady to leave the room. After some time alone with the officer, Georgia Cannady emerged from his office without pressing charges against Gerald Boisvert. During the next two months, Georgia was despondent and on several occasions expressed that she wished that she were dead. Cannady continued to suspect that Boisvert and other men had raped his wife and at one point lured Boisvert into his house and beat him.
Cannady testified that on the day of the murders he had drunk at least fourteen beers. He stated that on that day he and his wife were in the living room and that she was depressed over what he believed was the rape by Gerald Boisvert. Cannady stated that he got his .38 caliber pistol from a hiding place in the trailer and began to clean it. Cannady testified that his wife asked that he sit next to her on the living room couch and, as he started to get up with the gun in his hand, he tripped or his ankle gave out from under him and the gun fired. The bullet hit his wife in the chest, killing her.
The defendant's son, Christopher, testified that on that day he was watching a football game on television and heard a commotion in another part of the mobile home. He stated that his parents were fussing loudly and that, as he passed his parents on his way to the bathroom, his mother was sitting on the couch and his father was seated at the dining room table, doing something with his gun. While he was in the bathroom, Chris heard a gunshot and came out to find his mother lying on the floor. Christopher testified that at that point Cannady told him, "I had to do it," and that she was "gone" and "she's not suffering."
Cannady then told Christopher to get into the truck and they drove to Boisvert's house. On the way, Cannady told Christopher that he was going to kill Boisvert as he loaded his gun. When they arrived, Boisvert was standing in his front yard with another man and his two children. Cannady asked Boisvert for a beer to lure him to his truck. When Boisvert approached the truck, Cannady shot him in the head several times. Cannady then reloaded his gun, got out of his truck, and shot Boisvert again. In all, Cannady shot Boisvert seven times.
As Cannady drove away, he asked Christopher to reload his gun. Christopher refused. Cannady then drove to where Steve Russ lived. During the trip, Cannady told Christopher that he was going to kill Russ because of the problems he had caused at his bar. When Cannady got to Russ's house, he asked Russ for a beer but Russ did not have any. Cannady then shot at but missed Russ, who was standing in his front doorway. Russ fled through the house and Cannady ran after him and shot again, missing him. Russ was able to escape. As Cannady and Christopher returned home, Cannady placed the gun and bullets under the truck seat. Before doing so, he told Christopher that he knew he was going to prison. A police car followed Cannady home, where he was arrested.
The jury found Cannady guilty of the first-degree murder of his wife and Boisvert *168 and the attempted murder of Russ. In the penalty phase, Cannady testified on his own behalf and asked the jury to impose the death penalty.
During the penalty phase, a mental health expert, who had initially examined Cannady at the public defender's request, was called as a court witness. The expert testified that Cannady had advanced cerebral atrophy, in a more advanced state than would be expected in an individual his age. The expert also stated that the electroencephalogram test of Cannady's brain waves was normal and that there was no indication of a seizure disorder. He stated that Cannady was suffering from a major depression with suicidal tendencies. He also noted in his testimony that Cannady had a severe alcohol dependency problem, but that, in his opinion, he was sane under the M'Naghten test.[1] He explained Cannady's conduct by stating that Cannady believed that he would be unable to get any justice with regard to his wife. He stated that Cannady's mental condition led him to four suicide attempts, two of which were very serious. He believed that Cannady truly intended to kill himself. Other evidence was presented regarding Cannady's alcoholism.
At the conclusion of the penalty phase, the jury recommended the death sentence by a ten-to-two vote. In imposing the death sentence for each of these murders, the trial judge found that each murder was (1) heinous, atrocious, or cruel, pursuant to section 921.141(5)(h), Florida Statutes (1989), and (2) committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification, pursuant to section 921.141(5)(i), Florida Statutes (1989). In addressing the mitigating circumstances, the trial judge found: (1) that the evidence presented made a prima facie showing that Cannady was under the influence of mental or emotional disturbance but "not to any great extreme"; (2) that, although Cannady was under mental stress, he was under no physical duress and was not under the domination of any other person; (3) that, although Cannady was an alcoholic, his ability to conform his conduct to the requirements of law was not substantially impaired; and, (4) as a nonstatutory mitigating circumstance, that Cannady was an alcoholic and that his alcoholism had in fact caused brain atrophy.
In this appeal, Cannady claims that the trial court erred in: (1) excusing for cause several prospective jurors because of their views on the death penalty; (2) excluding Angela Cannady's testimony that her mother had told her that Boisvert had raped her; (3) failing to give a complete instruction on the meaning of "duress" when the jury asked for the definition of that word; (4) finding that both murders were committed in an especially heinous, atrocious, or cruel manner; (5) finding that both murders were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification; and (6) sentencing Cannady to death because such sentence is not proportionately warranted under the facts of this case.
Regarding his first claim, Cannady alleges that the trial court erred in excusing for cause four prospective jurors because of their views on the death penalty. The prospective jurors said during voir dire examination concerning the death penalty that they did "not believe in it" and, in the follow-up questions, that they did not think they could vote for it in a case. Defense counsel made a general objection to the excusal of these proposed jurors but did not object to the excusal of these jurors individually. Cannady now argues that the jurors should not have been excused without further inquiry as to whether they could set aside their views and follow the law and their oaths as jurors. The State, on the other hand, argues that the objection *169 made by defense counsel was a general objection based on the philosophy that no anti-death penalty jurors should be excused. We note that defense counsel agreed that one or two were excludable anyway. We find under the circumstances of this case that defense counsel did not preserve the issue for appeal. Floyd v. State, 569 So.2d 1225 (Fla. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991).
In his second claim, Cannady asserts that the hearsay statement made by his wife to his daughter concerning her rape was admissible. We find that statement was properly excluded by the trial judge since the information in that statement was never communicated to Cannady by either his wife or his daughter. Furthermore, the use of Georgia Cannady's statement to prove a rape is prohibited by section 90.802, Florida Statutes (1989), and the statement falls within no known exception to the hearsay rule. We do find that the statement could have been properly admissible during the penalty phase of the proceeding under the relaxed rules of evidence for the penalty phase proceeding. See § 921.141(1), Fla. Stat. (1989); Perry v. State, 395 So.2d 170 (Fla. 1980); Miller v. State, 332 So.2d 65 (Fla. 1976); State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974).
We find Cannady's third claim, relating to the trial judge's failure to define "duress" to the jury, to be without merit.
Next, Cannady asserts that the trial court erred in finding that both murders were committed in an especially heinous, atrocious, or cruel manner. Cannady argues that both killings were done quickly and without prolonged mental or physical suffering by either victim. He asserts that Georgia Cannady was shot once in the heart, and that Boisvert's murder was quick and the victim had no forewarning of what was about to happen. He contends that both died immediately or shortly after the first shot and that neither was tortured or suffered prolonged agony. In response, the State argues that the evidence supports the imposition of "heinous, atrocious, or cruel," arguing that neither victim died immediately.
We agree with Cannady that "heinous, atrocious, or cruel" does not apply under the circumstances of this case. Each of these victims was shot in a manner to kill the victim and without any prior knowledge by the victim that Cannady had any intention of doing so. As we recently explained in Robinson v. State, 574 So.2d 108, 112 (Fla.), cert. denied, ___ U.S. ___, 112 S.Ct. 131, 116 L.Ed.2d 99 (1991), "[o]rdinarily, an instantaneous or near-instantaneous death by gunfire does not satisfy the aggravating circumstance of heinous, atrocious, or cruel." Additionally, we explained in Williams v. State, 574 So.2d 136, 138 (Fla. 1991), that this aggravating "factor is permissible only in torturous murders  those that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another." See also Dixon. We find that neither of these murders complies with the definition of heinous, atrocious, or cruel as defined in Robinson, Williams, and Dixon. If we applied this aggravating factor under these circumstances, we would in effect be applying it to most, if not all, first-degree murders. Such a holding could result in a constitutional challenge to section 921.141(5)(h), Florida Statutes (1989). See Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).
In his fifth claim, Cannady argues that the trial court erred in finding that these murders were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. In Rogers v. State, 511 So.2d 526, 533 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988), we defined "cold, calculated, and premeditated" by stating that this aggravating circumstance requires evidence of calculation consisting of a careful plan or prearranged design. See also Amoros v. State, 531 So.2d 1256 (Fla. 1988).
*170 We find no evidence in this record that Cannady had been contemplating the murder of Georgia Cannady. We do find evidence in the record that an emotional dispute and argument occurred after Cannady had consumed fourteen beers. We further note that Georgia Cannady had consumed some alcoholic beverages because she had a .11 blood alcohol level. There was no evidence of any threats against her and no showing of any prior intent to kill her. Under these circumstances, we find that the aggravating factor of "cold, calculated, and premeditated" was not established as to the murder of Georgia Cannady.
With regard to the aggravating factor of "cold, calculated, and premeditated" as applied to the murder of Gerald Boisvert, it is uncontroverted that Cannady believed Boisvert had raped his wife. For this aggravating factor to apply to Boisvert's murder, the murder must have been "committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification." § 921.141(5)(i), Fla. Stat. (1989). Under the circumstances, the murder of Boisvert was not "cold," although it may have been "calculated." On the facts of this case, "[t]here was no deliberate plan formed through calm and cool reflection, only mad acts prompted by wild emotion." Santos v. State, 591 So.2d 160, 163 (Fla. 1991) (citation omitted). The emotional distress apparent from this record mounted over a two-month period, during which time Cannady continued to believe that Boisvert had raped his wife, causing her physical and emotional pain. It reached a pinnacle after Cannady killed his wife and set out to kill the apparent cause of her suffering. The trial court's findings that Cannady was under the influence of mental or emotional disturbance at the time of the murders and that he was an alcoholic suffering from brain atrophy were supported by expert testimony and further support the conclusion that Boisvert's murder was not the result of "cold" deliberation. Consequently, we conclude that this aggravating factor was not established for Boisvert's murder.
We have found that neither of the two aggravating circumstances found by the trial court was properly applied to the murders of Georgia Cannady and Gerald Boisvert. Even without those aggravating circumstances, however, the State asserts that the death penalty is still appropriate because the record supports the additional statutory aggravating factor of prior violent felony convictions based on Cannady's contemporaneous convictions in this case. See Pardo v. State, 563 So.2d 77 (Fla. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2043, 114 L.Ed.2d 127 (1991); Echols v. State, 484 So.2d 568 (Fla. 1985), cert. denied, 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 166 (1986). We disagree.
Under the circumstances of this case, it would be improper for this Court to impose the death penalty based on a single aggravating factor not found by the trial judge. Further, the aggravating factor of prior violent felony convictions was not submitted to the advisory jury and, apparently, was not submitted as an aggravating factor to the trial court in the penalty phase of this proceeding. Additionally, the State did not file a cross-appeal on this issue. Consequently, this issue has not been preserved for appeal.
Contemporaneous objection and procedural default rules apply not only to defendants, but also to the State. As such, we find that it would be inappropriate, and possibly a violation of due process principles, to remand this cause for resentencing. To do so would allow the State an opportunity to present an additional aggravating circumstance when the State did not initially seek its application, object to its noninclusion, or seek a cross-appeal on this issue.
The facts in this case are distinguishable from those presented in Echols and Pardo. In Echols, we noted the presence of concurrent murders as a possible fourth aggravating factor of prior violent felony conviction in justifying the trial judge's imposition of the death penalty in overriding the jury's recommendation of a life sentence. In doing so, we stated: "We cannot determine *171 whether the trial judge overlooked this fourth aggravating factor or was uncertain as to whether convictions for crimes committed concurrently with the capital crime could be used in aggravation." 484 So.2d at 576. However, in that case three other aggravating circumstances had also been properly established to justify the imposition of the death penalty in an uncontroverted contract killing.
In Pardo, the State sought, but the trial judge rejected, the additional aggravating factor of contemporaneous convictions. In rejecting the State's request for this instruction, the trial judge found that "the Legislature intended this aggravating factor to refer to offenses other than the ones for which [the defendant] is being accused and tried." 563 So.2d at 80. The State filed a cross-appeal in Pardo, and we reversed the trial judge's finding. We find that the holdings in Echols and Pardo are not applicable under the circumstances of this case.
Having found that neither of the two aggravating circumstances found by the trial court were properly applied in this case, and having further found that it would be improper to apply the contemporary conviction factor under the circumstances of this record, we must conclude that the death penalty cannot be imposed for either of the two murders in this case. As a result, Cannady's proportionality claim is moot. Accordingly, we affirm Cannady's convictions and his sentence for attempted first-degree murder, but we vacate his sentences of death and direct that sentences of life imprisonment without parole for twenty-five years be imposed for each of the first-degree murder convictions.
It is so ordered.
BARKETT, C.J., and OVERTON, SHAW, GRIMES and HARDING, JJ., concur.
KOGAN, J., concurs in result only.
McDONALD, J., dissents.
NOTES
[1] Florida follows the M'Naghten Rule, under which an accused is not criminally responsible if, at the time of the alleged crime, the defendant was, by reason of mental infirmity, disease, or defect unable to understand the nature and quality of his act or its consequences or was incapable of distinguishing right from wrong. Hall v. State, 568 So.2d 882 (Fla. 1990); Mines v. State, 390 So.2d 332 (Fla. 1980), cert. denied, 451 U.S. 916, 101 S.Ct. 1994, 68 L.Ed.2d 308 (1981); Wheeler v. State, 344 So.2d 244 (Fla. 1977).